GOLCONDA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No 59411. Filed December 23, 1957.

*Leonard L. Cowan, Esq.*, for the petitioner.
*Andrew Kopperud, Jr., Esq.*, for the respondent.

OPINION.

ARUNDELL, *Judge:* Respondent determined a deficiency in income tax for the taxable year ended January 31, 1952, in the amount of $1,694.46.

The only issue is whether an amount of $7,857.46 received by petitioner in the taxable year ended January 31, 1952, is taxable as long-term capital gain, as contended for by petitioner, or as ordinary income, as determined by respondent.

All of the facts were stipulated and are summarized below.

Petitioner was incorporated under the laws of the State of Illinois on April 10, 1947, with its principal offices in Chicago. It filed its corporation income tax return, Form 1120, for the taxable year ended January 31, 1952, with the then collector of internal revenue for the first district of Illinois. On Schedule D of this return it reported $7,857.46 as income from sale of patent on contract and classified it as net long-term capital gain.

Petitioner is engaged in manufacturing diamond tools and saws. Its entire issue of capital stock, consisting of $30,000-par-value common, is and has been owned since December 28, 1948, by Super-Cut, Inc. (hereafter sometimes referred to as Super-Cut), an Illinois corporation with its principal office in Chicago. Super-Cut engaged in manufacturing diamond wheels and products.

On October 11, 1949, Super-Cut was issued United States letters patent on a diamond-type tooth for rotary stone-cutting saws. On January 3, 1950, it was granted Canadian Letters Patent No. 462,265 on the same invention.

On February 1, 1951, Super-Cut and George Anderson & Co. of Canada, Ltd. (hereafter sometimes referred to as Anderson), entered into a written agreement concerning the Canadian Letters Patent No. 462,265. This agreement provided in part:

WHEREAS, Anderson, by virtue of being presently engaged in the manufacture and sale of diamond type saw teeth, is in a position to manufacture and sell diamond saw teeth of the aforementioned type in the Dominion of Canada and is desirous of obtaining exclusive license privileges under said Canadian Letters Patent No. 462,265;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and considerations hereinafter set forth the parties have agreed and do hereby agree as follows:

1. Super-Cut releases Anderson from any alleged claim for infringement of said Letters Patent No. 462,265 resulting from the manufacture and sale by Anderson of diamond type saw teeth prior to the date of this agreement.

2. Subject to the terms and conditions hereof, Super-Cut grants to Anderson the exclusive right, license and privilege to manufacture, use and sell throughout the Dominion of Canada, diamond type saw teeth of the aforementioned character under and by virtue of said Canadian Letters patent No. 462,265, it being understood that during the term or existence of this agreement Super-Cut shall not enter into the manufacture or sale in the Dominion of Canada of diamond saw teeth of the type heretofore specifically mentioned.

The agreement of February 1, 1951, further provided that Anderson was to pay Super-Cut 10 per cent of the regular selling price of diamond saw teeth sold under the agreement with a minimum yearly payment of $5,000; that Super-Cut could terminate the agreement (1) for a failure of Anderson to make the prescribed payments, or (2) if Anderson's production of saw teeth under the agreement was less than 80 per cent of its entire diamond variety saw-teeth business; and that after 3 years from the date of the agreement Anderson should have the right to terminate the agreement by giving Super-Cut 3 months' notice in writing. Paragraphs 7, 11, and 14 of the agreement provided:

7. In the event of infringement of the Letters Patent under which license privileges are herein granted, it shall be the duty of Super-Cut to institute and diligently to prosecute proper legal proceedings at its own expense. Should Super-Cut fail to institute such proceedings within ninety (90) days from

receipt of written notice by Anderson advising Super-Cut of the existence of infringement, Anderson, at its own expense, may institute suit for infringement in its own name and join Super-Cut as a party-plaintiff. In the event of institution of a suit for infringement by Anderson it is understood and agreed that Super-Cut may participate and be represented by its own counsel and that any recovery of damage shall belong to Anderson.

\* \* \* \* \* \* \*

11. This agreement shall be deemed to have been entered into in the City of Montreal, in the Province of Quebec, Dominion of Canada and shall be interpreted and governed by and under the laws of the Dominion of Canada.

\* \* \* \* \* \* \*

14. This agreement shall inure to the benefit of, and be binding upon, the successors, assigns and legal representatives of Super-Cut and may be assigned by Anderson only with the written consent of Super-Cut.

On February 1, 1951, an assignment without consideration was executed by Super-Cut and accepted and agreed to by petitioner effective as of February 1, 1951, whereby Super-Cut "hereby assigns and transfers \* \* \* its full and entire interest in and to" the February 1, 1951, agreement between Super-Cut and Anderson.

The invention covered by the Canadian patent No. 462,265 was developed in the shop of Super-Cut.

In a statement attached to the deficiency notice, the respondent explained his determination in part as follows:

(a) It has been determined that the amount of $7,857.46 received by you during the fiscal year ended January 31, 1952 from George Anderson & Co. of Canada, Ltd. under the terms of an agreement dated February 1, 1951 is taxable as ordinary income under the provisions of section 22 (a) of the Internal Revenue Code of 1939.

The determination of whether the $7,857.46 received by petitioner is taxable as "long-term capital gain" as that term is defined in section 117 (a) (4) of the Internal Revenue Code of 1939, as amended, or as ordinary income under the provisions of section 22 (a), depends upon whether the agreement of February 1, 1951, between Super-Cut and Anderson was a mere licensing arrangement or an assignment of the patent. In determining whether the agreement was a license or an assignment, we recognize that the term used in the agreement "exclusive license" is not controlling or conclusive. *Waterman* v. *Mackenzie*, 138 U. S. 252; *Parke, Davis & Co.*, 31 B. T. A. 427; *Edward C. Myers*, 6 T. C. 258; *Carroll Pressure Roller Corporation*, 28 T. C. 1288. The Supreme Court in *Waterman* v. *Mackenzie, supra*, said in part (at p. 256):

Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions. For instance, a grant of an exclusive right to make, use and vend two patented machines within a certain district is an assignment, and gives the grantee the right to sue in his own name for an infringement within the district, because the right, although limited to

making, using and vending two machines, excludes all other persons, even the patentee, from making, using or vending like machines within the district. * * *

All of the criteria mentioned by the Supreme Court in the *Waterman* v. *Mackenzie* case are present here. Super-Cut granted Anderson the exclusive right to make, use, and vend the diamond-type tooth covered by the Canadian Letters Patent No. 462,265 throughout the Dominion of Canada. Anderson had the right to sue in its own name for an infringement and Super-Cut was prohibited from making, using, or vending the diamond-type tooth anywhere in the Dominion. In cases where all such criteria are present, it has been held consistently that the particular contract between the parties was an assignment and sale rather than a license.[1]

In his brief the respondent cites certain provisions contained in the February 1, 1951, agreement between Super-Cut and Anderson and argues that such provisions negative a holding that the agreement was a sale. These provisions are (1) that in the agreement the parties used the term "exclusive license," (2) that the mode of payment is measured by sales, (3) that Super-Cut could terminate the agreement if Anderson failed to make the prescribed payments or if Anderson's production of saw teeth was less than 80 per cent of its entire diamond variety saw-tooth business, (4) that in the event of infringement, Super-Cut should institute legal proceedings, and (5) that the agreement could be assigned by Anderson only with the consent of Super-Cut. We have already considered the first provision and held it to be neither controlling nor conclusive. As to the second provision, practically all of the cases cited in our footnote 1 contained similar provisions. The right to terminate on breach was considered by us in *Carroll Pressure Roller Corporation, supra*. See also *Lawrence* v. *United States*, (C. A. 5, 1957) 242 F. 2d 542, where the court said "that the possibility of termination by a licensor upon default of the license was a condition subsequent which did not negate the sale of the invention." This is the conclusion of the authorities generally. *Allen* v. *Werner*, (C. A. 5, 1951) 190 F. 2d 840. As to the fourth provision, we do not regard it as detrimental to petitioner's case that the parties agreed that Super-Cut should in case of infringement initiate the necessary legal proceedings. The agreement also provided that should Super-Cut fail to institute such proceedings, Anderson might do so in its own name. The court, in *Allen*

[1] *Commissioner* v. *Hopkinson*, (C. A. 2, 1942) 126 F. 2d 406; *Commissioner* v. *Celanese Corp.*, (C. A., D. C., 1944) 140 F. 2d 339; *Edward C. Myers*, 6 T. C. 258; *Halsey W. Taylor*, 16 T. C. 376 (1951); *Kavanagh* v. *Evans*, (C. A. 6, 1951) 188 F. 2d 234; *Allen* v. *Werner*, (C. A. 5, 1951) 190 F. 2d 840; *Kronner* v. *United States*, (Ct. Cl., 1953) 110 F. Supp. 730; *United States* v. *Carruthers*, (C. A. 9, 1955) 219 F. 2d 21; *Massey* v. *United States*, (C. A. 7, 1955) 226 F. 2d 724; *Lawrence* v. *United States*, (C. A. 5, 1957) 242 F. 2d 542; *Storm* v. *United States*, (C. A. 5, 1957) 243 F. 2d 708; *Franklin S. Speicher*, 28 T. C. 938 (1957); *Carroll Pressure Roller Corporation*, 28 T. C. 1288.

v. *Werner, supra,* considered a provision similar to the fifth provision mentioned above and said, "Nor does the existence in the grantee of the right of cancellation or the prohibition of unlimited assignment require, under the circumstances here, determination that the agreement did not evidence a sale," citing cases.

Finally, the respondent makes a point that because paragraph 11 of the agreement between Super-Cut and Anderson provided that the agreement "shall be interpreted and governed" by the laws of Canada, and since petitioner has offered no evidence as to such laws, our decision should be against petitioner for failure of proof. In its brief petitioner says: "There are two answers to this point: (a) the answer of the Commissioner did not raise this defense and the objection comes too late. (Rule 14, Tax Court) ; (b) the agreement of the parties can relate only to controversies between them. Obviously, they could not contract away the effect of the revenue laws of the United States."

The deficiency notice carries no indication that respondent's determination was in any way based on Canadian law.

We know of no reason why the laws of Canada are at all material in deciding the tax question involved in this case. While it is true that "[t]he national courts follow the local decisions respecting the nature of property interests," *Lane* v. *Corwin,* 63 F. 2d 767, and "[t]he legality of a contract is to be determined by the law of the place where it is made," *Commissioner* v. *Hyde,* 82 F. 2d 174, we have neither of those questions before us. Cf. *Burnet* v. *Harmel,* 287 U. S. 103. There is no dispute as to petitioner's right to the $7,857.46 it received from Anderson. The only question is the manner in which it is to be taxed, whether as a long-term capital gain or as ordinary income. As to that question, we think the decisions cited by us are controlling.

We hold, therefore, that the $7,857.46 in question is taxable to petitioner as a long-term capital gain and that the respondent erred in determining that it was taxable as ordinary income.

*Decision will be entered under Rule 50.*